Eric I. Abraham (eabraham@hillwallack.com)
William P. Murtha (wmurtha@hillwallack.com)
Kristine L. Butler (kbutler@hillwallack.com)
**HILL WALLACK LLP**
21 Roszel Road
Princeton, New Jersey 08543
(609) 924-0808

William R. Thomas (*pro hac vice forthcoming*)
David B. Summer, Jr. (*pro hac vice* forthcoming)
**PARKER POE ADAMS & BERNSTEIN LLP**
1221 Main Street
Suite 1100
Columbia, SC 29201
(803) 255-8000
willthomas@parkerpoe.com
dsumner@parkerpoe.com

*Attorneys for Plaintiffs*
*Prime Plastic Surgery Associates Corp.*
*and Prime Plastic Surgery Management LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **PRIME PLASTIC SURGERY ASSOCIATES CORP. and PRIME PLASTIC SURGERY MANAGEMENT LLC,**<br><br>Plaintiffs,<br><br>v.<br><br>**ALYCE CUCURULLO,**<br><br>Defendant. | Civil Action No. ______________<br><br>**COMPLAINT AND JURY DEMAND** |

**<u>COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS, COMPUTER FRAUD, BREACH OF FIDUCIARY DUTY, AND RELATED BUSINESS TORTS</u>**

Plaintiffs Prime Plastic Surgery Associates Corp. ("Prime PC") and Prime Plastic Surgery Management LLC ("Prime Management") (together, "Plaintiffs" or "Prime"), by and through their

undersigned counsel, bring this Complaint against Defendant Alyce Cucurullo ("Cucurullo" or "Defendant"), and allege as follows:

**THE PARTIES**

1. Plaintiff Prime PC is a professional corporation organized under the laws of the State of California with its principal place of business in La Mesa, California. Prime PC is the practice entity through which Dr. Nassif rendered professional medical services, and it owns the patient medical and financial records, the accounts receivable, and the exclusive right to bill for and collect Dr. Nassif's professional fees.

2. Plaintiff Prime Management is a limited liability company organized under the laws of the State of Delaware. Prime Management holds the assets and goodwill acquired from the Nassif practice in the October 2022 transaction, together with the practice's systems and infrastructure.

3. Cucurullo is an individual who is domiciled in Somerset County, New Jersey, and she is a citizen of the State of New Jersey. At all relevant times, Cucurullo served as the business manager, operational representative, and chief executive of the Beverly Hills practice within Plaintiffs' practice structure. She managed practice operations, interacted with vendors and personnel, accessed and controlled practice systems and records, participated in billing and financial functions, and held herself out as chief executive of the NassifMD enterprise.

**NATURE OF THE ACTION**

4. This action arises from Cucurullo's use of her position of trust as the business manager and chief executive of the aesthetic plastic surgery enterprise associated with Paul S. Nassif, M.D., to direct Dr. Nassif's practice from the inside while she engineered its departure from the outside, to build and promote a competing surgical platform in California, and to divert patients, revenue, confidential information, and practice opportunities away from Plaintiffs. By her own account, she did not merely assist that departure; she led it. As she states on her own professional website, she

"oversee[s] all Nassif enterprises" and has been "actively driving the exit strategy for the medical practice." (Exhibit A hereto).

5. In October 2022, PPS MSO Holdings, LLC acquired substantially all of the assets and goodwill of the Nassif practice and, on the same day, contributed and assigned all of those assets to its then wholly owned subsidiary, Plaintiff Prime Management. These assets included the Nassif practice's goodwill, brand, domain names, and marks associated with and symbolizing that goodwill. Plaintiff Prime PC became the practice entity through which Dr. Nassif rendered professional services. Cucurullo served the practice under a December 15, 2021 independent contractor agreement with Paul Nassif, M.D. Inc. and Dr. Nassif, the sellers of the October 2022 transaction. A month before that transaction closed, Dr. Nassif asked Prime's then-chief executive, George Scopetta, to keep Cucurullo engaged as their shared "trusted confidant and advisor" through the post-closing transition, and Scopetta agreed. (Exhibit B hereto).

6. Cucurullo was not a passive assistant. Instead, she was a consultant to Prime and simultaneously served as Chief Executive Officer of the NassifMD enterprise, including GCC Aesthetics, Dr. Nassif's skincare company. (Exhibit N hereto). While serving under her independent contractor agreement, Cucurullo managed Prime's Beverly Hills practice, supervised and directed its staff, controlled its systems, vendors, and patient-facing operations, and exercised operational authority over the practice and its systems. Hence, she occupied a relationship of trust and confidence with Plaintiffs.

7. Beginning no later than July 2024, and while continuing to draw compensation through Plaintiffs' structure, Cucurullo worked to extract Dr. Nassif from Plaintiffs' practice platform, to pressure Plaintiffs and their lender, and to establish and promote competing aesthetic plastic surgery operations at Sharp Coronado Hospital and in Newport Beach, California. She also diverted Plaintiffs' surgical patient information to a skincare company owned by Dr. Nassif and

operated under Cucurullo's authority as Chief Executive Officer, misused Plaintiffs' confidential information and records, and participated in the concealment and deletion of relevant materials.

8. Cucurullo's conduct has caused Plaintiffs damages in an amount exceeding $75,000, exclusive of interest and costs. Plaintiffs seek compensatory damages, disgorgement, punitive damages, injunctive relief, and other relief as set forth below.

## JURISDICTION AND VENUE

9. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Each of these federal claims independently supports this Court's jurisdiction over this action, regardless of the parties' citizenship.

10. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state-law claims because those claims are so related to the federal claims that they form part of the same case or controversy. Plaintiffs' federal claims and each of Plaintiffs' state-law claims arise from the same course of conduct: Cucurullo's access to, administration of, and control over Plaintiffs' practice systems and confidential information while she served as Plaintiffs' business manager and chief executive, and her use of that access, control, and information to compete against and divert business from Plaintiffs between July 2024 and July 2026, as detailed in the Factual Background below. In exercising supplemental jurisdiction over the state-law claims, the Court applies New Jersey's choice-of-law rules. Under those rules, the substantive law of California governs Plaintiffs' state-law claims, because the conduct at issue and the resulting injury center on California. To the extent New Jersey substantive law applies to any claim, Plaintiffs plead their state-law claims in the alternative under New Jersey law.

11. This Court has personal jurisdiction over Cucurullo because she is domiciled in and a citizen of New Jersey, and because she conducted the business and communications at issue, in substantial part, from New Jersey.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred through Defendant's conduct directed from this District.

13. Assignment to the Trenton Vicinage is appropriate under Local Civil Rule 40.1(a) because Defendant resides in Somerset County, New Jersey.

## FACTUAL BACKGROUND

### A. The 2022 Transaction and the Practice Structure

14. In October 2022, PPS MSO acquired substantially all of the assets of Paul Nassif, M.D. Inc. and the goodwill associated with the aesthetic plastic surgery practice historically associated with Dr. Nassif, and contributed and assigned those assets to Prime Management on the same date. In connection with that transaction, Dr. Nassif and his professional corporation entered into agreements governing Dr. Nassif's medical practice and the business relationship between Plaintiffs and Dr. Nassif, including a Professional Services Agreement ("PSA") with Prime PC and Restrictive Covenant Agreements ("RCA") now held and enforceable by Prime Management.

15. Prime PC became the practice entity through which Dr. Nassif rendered professional services. Under the practice structure, Prime PC bills for, collects, and owns the fees charged for Dr. Nassif's services and the related accounts receivable, and the medical and financial records of patients treated within the scope of the engagement are the property of Prime PC.

16. Plaintiffs paid substantial consideration, approximately $18 million, in the acquired goodwill, brand, patient relationships, systems, and confidential information of the practice, and relied on the loyalty of the personnel who operated it, including Cucurullo.

**B. Cucurullo's Role, Access, and Duties**

17. Cucurullo served as the practice's business manager and chief operating executive. Her independent contractor agreement provides that she performed "Fractional CEO/COO duties" and held "Executive & Financial Oversight of the Medical Practice & Med Spa." (Exhibit C hereto). She supervised staff associated with the Beverly Hills practice location, controlled the practice's information-technology systems and vendor relationships, administered its financial and billing functions, and created and transmitted transaction and legal documents on behalf of Dr. Nassif and his entities. She held herself out as the enterprise's chief executive, signing practice communications and agreements as "NassifMD CEO," and she negotiated the practice's Beverly Hills office lease with outside California counsel. (Exhibit D hereto)

18. Regardless of the label attached to her engagement, Cucurullo occupied a position of trust and confidence, exercised discretionary authority over Plaintiffs' business, and acted as an agent entrusted with Plaintiffs' confidential information, systems, and patient relationships. As Plaintiffs and Dr. Nassif worked toward the October 2022 transaction, Dr. Nassif confirmed that Cucurullo would remain an important part of the post-closing practice structure. On September 20, 2022, he emailed Plaintiffs' officer that he wanted to ensure the Prime team could "lean on" Cucurullo going forward, explaining that "you and I will need her," and that it was important to him personally that she continue as their "trusted confidant and advisor." (Exhibit B hereto). Dr. Nassif also requested that Cucurullo's $5,000 monthly retainer, consistent with the terms of her independent contractor agreement, be paid from his profit and loss, and Plaintiffs agreed to that

arrangement. On October 1, 2024, Cucurullo contacted a Prime representative and demanded the $5,000 payment. (Exhibit E hereto). When Plaintiffs explained that they could not process the payment without her independent contractor agreement, Cucurullo stated that she would obtain and provide a copy. After receiving the agreement, Plaintiffs continued paying Cucurullo through July 2026, at which point Cucurullo resigned. In total, Plaintiffs paid Cucurullo approximately $260,000 in payments and reimbursements for the executive, financial oversight, business-management, and advisory duties she performed for the practice.

19. Cucurullo held herself out in communications as having operational authority over the Beverly Hills practice location and its systems. In or about April 2026, in connection with a transition of the practice's information technology, she stated in substance that the Nassif practice was "outside the normal protocols" and that "we are the admin on most our systems," reflecting the degree of control she exercised over Plaintiffs' systems and data. (Exhibit F hereto).

20. By virtue of her role, access, and the trust placed in her, Cucurullo owed Plaintiffs a duty of loyalty and a fiduciary duty to act in Plaintiffs' best interests, not to compete against them, not to divert their patients, revenue, or opportunities, and not to use or disclose their confidential information for the benefit of a competing venture.

21. As of the date of this Complaint, Cucurullo's own professional consulting-company website states, under the heading "Companies I've Lead," that she "oversee[s] all Nassif enterprises including NassifMD Skincare (10x growth) and the medical practice," and that she is "actively driving the exit strategy for the medical practice." (Exhibit A hereto). Cucurullo's own public description of her role confirms the breadth of the authority she exercised over Plaintiffs' practice and the competing ventures alleged below, and her own admission that she was directing, not merely assisting, the practice's departure from Plaintiffs' platform.

22. In January 2026, Prime Management proposed formalizing Cucurullo's services under an amended and restated independent-contractor agreement. The proposal would have required her to report to Prime's chief executive officer, act in Prime Management's best interests, avoid conflicts of interest, and protect Prime's confidential information, in exchange for her existing annual base compensation of $60,000 and a substantial performance incentive tied to the financial results of the Nassif practice.

23. Cucurullo declined the proposed arrangement after discussing it with Dr. Nassif. She informed Prime's representative that Dr. Nassif viewed the proposed incentive structure as inconsistent with her continuing alignment with him. That position was inconsistent with the premise on which Prime had agreed, at Dr. Nassif's request, to continue paying Cucurullo for her services: that she would serve as a shared trusted confidant and advisor to both Dr. Nassif and Prime. (Exhibit A hereto). If Cucurullo's role was properly understood as one of mutual trust and confidence, an agreement requiring her to act in Prime Management's best interests should not have conflicted with her relationship with Dr. Nassif. Her refusal on that basis therefore confirmed that, notwithstanding Dr. Nassif's earlier representation, Cucurullo and Dr. Nassif secretly viewed her loyalty as running only to him rather than to both him and Plaintiffs.

24. Cucurullo nevertheless continued to perform and receive her flat monthly compensation for practice-related functions for a period following that proposal. On July 24, 2026, she notified Prime that she would end her consulting relationship with Prime effective July 31, 2026, while continuing to serve as chief executive officer of the Nassif Company and GCC Aesthetics, Inc. and as an advisor to Dr. Nassif.

25. Thus, while continuing to occupy a senior operational position funded through Plaintiffs' structure, Cucurullo declined an arrangement that would have formally required her to

act in Prime Management's interests. She instead chose to preserve her undivided role as chief executive of entities owned or controlled by Dr. Nassif.

**C. The Mission Viejo Accommodation**

26. In August 2024, Dr. Nassif proposed testing demand for his services in Orange County, California through a limited shared-space arrangement with an existing plastic surgery practice in Mission Viejo, California. Before proceeding, Dr. Nassif disclosed the arrangement to Plaintiffs, obtained written permission for that specific test, and the resulting revenue was kept within the Prime platform. The one-time written accommodation was limited to that specific arrangement and did not extend to other locations or other competing activity.

27. Cucurullo participated in and was aware of the Mission Viejo accommodation and the disclosure and approval process it required. Her handling of that arrangement demonstrates that she knew Plaintiffs' consent was required before Dr. Nassif engaged in competing or overlapping activity outside the Prime platform, and that she knew how to seek and obtain that consent when she chose to.

28. Notwithstanding that knowledge, before and after the Mission Viejo accommodation, Cucurullo withheld from Plaintiffs her and Dr. Nassif's plans for further Orange County activity. Before a May 2024 meeting with a representative of a private-equity firm considering an acquisition of the Prime platform, Cucurullo prepared instructions coaching Dr. Nassif not to mention the planned Orange County move or the anticipated departure of the practice's manager, and Dr. Nassif agreed to follow that instruction. Unlike the disclosed and approved Mission Viejo arrangement, the Newport Beach location, described below, was developed without advance disclosure to Plaintiffs or any written accommodation.

**D. The Campaign to Extract Dr. Nassif and Pressure the Platform**

29. Although Plaintiffs owned the Nassif brand, beginning no later than July 2024, Cucurullo undertook a course of conduct designed to separate Dr. Nassif and the value of the Nassif brand from Plaintiffs' platform. She engaged outside California counsel and communicated with outside financing sources and potential buyers concerning a possible buyout or refinancing of the Nassif practice. In doing so, Cucurullo disclosed Plaintiffs' nonpublic financial, compensation, and practice information without Plaintiffs' knowledge or authorization.

30. In or about July 2024, Cucurullo wrote, in substance, of "how we cause WO pain," referring to Plaintiffs' lender, White Oak, and stated that she had her "own irons in the fire to possibly extract Dr N[assif]" from the platform.(Exhibit G hereto). These communications reflect Cucurullo's intent to act against Plaintiffs' interests while she remained inside their structure.

31. In or about October 2025, Cucurullo prepared or circulated materials describing the Nassif brand as operating "independently" and at a "clear distance from the corporate parent," and as a "prestige asset, not a scalable growth platform." (Exhibit H hereto). Those statements are consistent with a coordinated effort to separate and redirect the value of the Nassif brand, goodwill, and practice opportunities away from Plaintiffs.

**E. Building and Promoting the Competing Sharp Coronado Platform**

32. Cucurullo coordinated the development of a competing aesthetic plastic surgery operation at Sharp Coronado Hospital in California. When Dr. Nassif was credentialed at Sharp Coronado Hospital with a start date in or about May 2025, Cucurullo coordinated the associated credentialing, systems training, and administrative setup.

33. On or about June 24, 2025, Cucurullo wrote, in substance, that "[t]he plan for Sharp is to use our PN (PatientNow System) for billing and invoicing patients but their system all else," and that Sharp had "set Dr Nassif up in EPIC." (Exhibit I hereto). This initial billing and invoicing

structure showed that Cucurullo knew they needed to bill through Prime's system; but at some point, this changed and they would be billed without any use of Prime's systems, violating the terms put in place.

34. On or about March 31, 2026, two additional surgeons that were Prime Fellows were credentialed at Sharp Coronado Hospital, and Cucurullo was authorized as a user in Sharp's credentialing portal, writing in substance that "[y]ou and I have access to their accounts." (Exhibit J hereto). This activity reflects the development of a multi-provider competing platform rather than an isolated engagement.

35. In or about May 2026, Dr. Nassif was publicly featured in an advertisement in *San Diego Magazine* promoting the Sharp Coronado Hospital cosmetic surgery program, directing prospective patients to Sharp consultation channels and making no reference to Plaintiffs. (Exhibit K hereto). Dr. Nassif was also listed on Sharp Coronado's Hospital as one of their providers. Cucurullo coordinated and facilitated the practice's participation in that competing promotion.

**F. The Newport Beach Expansion**

36. Cucurullo directed and participated in the establishment of a competing NassifMD-branded location at 567 San Nicolas Drive, Suite 320, in Newport Beach, California. Sometime after September 2025, Cucurullo coordinated the Newport Beach lease search with a commercial real-estate broker, reviewed floor plans and lease materials for that suite, and coordinated the buildout of the Newport Beach footprint. The Newport Beach location was not disclosed to Plaintiffs, was not leased or paid for by Plaintiffs, and generated no revenue remitted to Plaintiffs.

37. As with the Orange County plans she had already coached Dr. Nassif to conceal, *see* ¶ 29 above, Cucurullo continued to withhold the Newport Beach plans from Plaintiff as they developed. In May 2025, while arranging an amendment to the Beverly Hills office lease with the landlord, she instructed the landlord's counsel not to disclose to Plaintiffs their discussions

concerning lease-extension options, stating that they did not want to "telegraph any future plans" (Exhibit D hereto) until those plans were in place. In June 2025, while those plans were continuing, office communications from Cucurullo informed staff that the Nassif practice operated independently of Prime. (Exhibit H hereto).

38. Those statements and instructions reflected more than administrative separation between the clinical and management sides of the practice. They were made while Cucurullo was developing a separate Orange County location, withholding lease-related plans, and creating patient-facing and communications channels outside Plaintiffs' managed systems.

**G. Diversion of Patients and Revenue Through the Preoperative Skincare Program**

39. In March 2025, Ms. Cucurullo used her access to Prime's confidential patient scheduling and deposit records to design and implement a direct-to-consumer sales channel. She also directed other employees to solicit Prime's surgical patients on Prime's time. The sales channel routed those patients to NassifMDSkincare.com, a website and business owned personally by Dr. Nassif and managed by Cucurullo as Chief Executive Officer, while bypassing any sale, markup, or billing through Prime. This preoperative skincare program used Prime's confidential patient information, including patient identity, surgery dates, and type of surgical procedure. That information was protected as Confidential Information under the Restrictive Covenant Agreements and as Prime property under Section 4.1(a) of the Professional Services Agreement. Cucurullo used this Confidential Information without Prime's consent to financially benefit Dr. Nassif's separately-owned company.

40. Cucurullo likewise placed the practice's paid advertising and patient-lead capture in channels controlled by Dr. Nassif's interests rather than Plaintiffs. The practice's Google Ads account was created on Cucurullo's personal email account, with the owning entity identified as GCC Aesthetics, Inc., Dr. Nassif's wholly owned skincare company, for which Cucurullo also

served as Chief Executive Officer, and was verified under that entity at the Beverly Hills address, while Plaintiffs were provided only read-only access. Cucurullo described the consolidation of the advertising platforms as undertaken "in part to get ownership over the ad campaigns." (Exhibit L hereto). The practice's social-media advertising and the resulting patient leads were handled through a NassifMD Skincare marketing identity, and in or about October 2025 Cucurullo signed a lead-management services agreement in the name of Nassif MD Plastic Surgery that captured the practice's incoming patient inquiries, by phone, email, text, and message, in a system controlled by the Nassif operation. In or about July 2026, Dr. Nassif directed that patient reviews be captured under his individual name rather than under the practice, further redirecting goodwill away from Plaintiffs.

**H. Misuse of Confidential Information and Practice Records**

41. Plaintiffs' confidential information includes the practice's compiled list of patients and their treatment histories and contact information, customer and referral-source lists, confidential pricing and fee schedules, non-public financial and compensation data, business and expansion plans, vendor lists and terms, and proprietary patient-communication templates and intake, marketing, and operating systems and forms. This information was developed and compiled over years and at substantial expense, is not generally known to or readily ascertainable by competing aesthetic-surgery operations, and derives independent economic value from its secrecy. Plaintiffs took reasonable measures to maintain the secrecy of that information, including restricting access to authorized personnel, maintaining the information on password-protected practice systems, and imposing contractual confidentiality obligations on those given access.

42. Cucurullo used and disclosed Plaintiffs' confidential information for the benefit of competing ventures, including in connection with establishing the Sharp Coronado venture, the transfer or use of patient-communication templates and Prime's Electronic Medical Record

Platform ("EMA") materials, the Dubai venture described in Section I below, and the use of practice systems and vendors to support competing activity. Dr. Nassif's personally owned paulnassifmd.com domain provided email addresses to at least two Prime employees, and a Prime employee used one of those addresses to send patient lists to other Prime personnel, exposing that confidential information outside systems controlled by Plaintiffs.

43. Although the October 2022 asset purchase conveyed to Plaintiffs the practice's assets and Dr. Nassif's goodwill, brand, domain names, and the marks associated with and symbolizing that goodwill, Cucurullo controlled the disposition of the domain names and trademark-related online accounts and credentials associated with the Nassif practice and did not deliver them to Plaintiffs. She held the practice's domains in a separate registrar account she controlled; in or about October 2023 she stated that she had "moved these domains to their own GoDaddy account" and doubted, incorrectly, that the acquiring group had ever taken ownership; and during the 2024 diligence, she confirmed that Plaintiffs' group had "never transferred formal ownership of any domains or trademarks" and that she had moved a majority of the Nassif-related domain names, and initiated the transfer of the remaining domains, into a GoDaddy account associated with Dr. Chao. (Exhibit M hereto). Cucurullo also forwarded Plaintiffs' business and confidential materials to her own email accounts, including a full domain export, lease litigation documents, patient communications concerning Dr. Nassif's care, and another physician's contracts with the acquiring group.

44. Plaintiffs' structure also paid invoices totaling approximately $51,250 for spaldingplasticsurgery.com, an asset excluded from the acquired practice, and Cucurullo caused, permitted, or concealed those payments for the benefit of interests adverse to Plaintiffs. When the payments were made, Cucurullo caused the website to be identified under a trade name associated with Plaintiffs, which concealed that Plaintiffs' funds were being used for an excluded asset. After

she resigned, the payment description was changed to identify the actual domain, spaldingplasticsurgery.com, a domain Plaintiffs had not acquired and never agreed to fund.

**I. The Proposed Dubai Surgical Venture**

45. Beginning no later than November 2023, Cucurullo participated in discussions concerning an aesthetic plastic surgery opportunity at a facility in Dubai. The contemplated arrangement would have positioned Dr. Nassif as a visiting surgeon performing facial plastic surgery procedures during periodic visits, with the Dubai facility providing operating-room support, patient screening, follow-up care, and related local services.

46. Cucurullo participated directly in developing the proposed arrangement. She requested information concerning professional-fee allocation, travel and accommodations, malpractice coverage, local licensing, and the responsibilities of the Dubai facility, and requested the proposed fee-sharing terms for discussion with Dr. Nassif. After receiving proposed financial terms, Dr. Nassif provided information concerning surgeon fees charged through Plaintiffs' Beverly Hills practice location and asked whether the proposed Dubai pricing could be increased. The communications also addressed contemplated procedures, case volume, revenue, patient recruitment and screening, follow-up care, and the allocation of financial and operational responsibilities.

47. The Dubai activity continued beyond those initial discussions. In July 2025, Dr. Nassif directed Cucurullo to manage communications concerning the renewal, transfer, or reattachment of his Dubai professional license to NovoMed. Those communications addressed cancellation of an existing professional affiliation, attachment of the license to the contemplated facility, and the administrative steps required to complete that process.

48. In developing the Dubai opportunity, Cucurullo used and disclosed nonpublic information concerning the Beverly Hills practice's procedures, surgeon fees, pricing, anticipated

case volume and revenue, professional-fee allocation, operations, and patient-recruitment model, information she was entrusted with as Plaintiffs' business manager and chief executive and had a duty not to use for the benefit of a competing venture.

**J. The CAP Insurance Misrepresentation**

49. Cucurullo signed repayment instructions that named the Beverly Hills Doctors Surgery Center as the "Contributor" and, in doing so, misrepresented the true owner and contributor to a professional-liability carrier That conduct exposed Plaintiffs to risk and reflects Cucurullo's willingness to act against Plaintiffs' interests in the operation of the practice she was entrusted to manage.

**K. Concealment and Deletion of Records**

50. In May 2026, Cucurullo's assertion of administrative control over the practice's systems, described in Paragraph 19 above, resulted in Sarah Throne, Alex Swanson, and Tin Francisco losing login access to the PatientNow system that Cucurullo administered for the practice. Cucurullo's administrator-level access to PatientNow extended only to onboarding new users and deactivating the accounts of terminated personnel; none of the three excluded individuals had been terminated. Ashleigh Ignelzi, the practice's Practice Manager (referred to internally, interchangeably, as its "Practice Administrator"), was the only other person who held administrator-level access to PatientNow, and Cucurullo and Ms. Ignelzi were the only two people who retained access to the system throughout the outage. Prime personnel identified the loss of access early that morning and raised it with Cucurullo, who responded that she was looking into it. Ms. Throne, Mr. Swanson, and Mr. Francisco each also emailed Cucurullo directly that morning to report the loss of access. Plaintiffs' team did not regain access for approximately six hours, delaying the accounting team's monthly reconciliation and other financial tasks. Cucurullo later attributed the outage to Ms. Ignelzi accidentally deleting users.

51. Upon subsequent review of the PatientNow system, Plaintiffs determined that, during the six-hour lock-out window, the description of every Monday calendar block for Dr. Nassif changed from "Sharp Hospital – Seeing Patients" to "OUT – ask Ashleigh before booking." Those Monday blocks corresponded to the days on which, as alleged in Section E above, Dr. Nassif treated patients at Sharp Coronado Hospital under the Sharp arrangement Cucurullo helped develop and administer. Because Ms. Ignelzi, like Cucurullo, retained access to PatientNow throughout the six-hour outage described in Paragraph 50 above, the calendar change could only have been made by one of the two people who controlled the system during that window. That change occurred only because, and only while, Cucurullo's control over PatientNow deprived Plaintiffs of the ability to observe or prevent it, and reflects an effort to conceal from Plaintiffs the extent of Dr. Nassif's Sharp Coronado activity.

52. On or about July 21, 2026, an automated alert notified that a large number of files had recently been deleted from the practice's OneDrive, which is a cloud storage service that lets the user store files online and access them from any device. Responsive communications were also recovered from the "Deleted Items" folder of Cucurullo's email account, to which Cucurullo moved her historical email correspondence on or about July 31, 2026. The timing and subject matter of these deletions reflect an effort to conceal the conduct alleged in this Complaint. Plaintiffs have retained a forensic information-technology consultant to determine the scope and content of the deleted files.

**L. Cucurullo's Retention of Control Over Practice Accounts After Her Departure**

53. On July 27, 2026, before her resignation took effect, Prime's Chief Executive Officer wrote to Cucurullo and demanded that she, among other things, "[r]eturn or transfer all Prime credentials and administrative access, including access to email, cloud storage, banking, accounting, marketing platforms, social media accounts, patient-management systems, websites,

domains, and any other systems or accounts [she] used or administered." (Exhibit N hereto). He also reminded her that her obligation not to delete, alter, conceal, transfer, overwrite, or make inaccessible any Prime-related information, including information stored on personal accounts, personal devices, and cloud platforms, continued after her departure. *Id.*

54. Cucurullo responded in writing on July 29, 2026. She confirmed that "Prime controls [her] access to its email, OneDrive, banking, accounting, and other corporate systems" and that "Ashleigh or another Prime administrator can remove or modify [her] access to PatientNow and other Prime-controlled platforms." *Id.* She represented that she did "not possess any other Prime-owned computer, phone, hard drive, key, or physical property" and disclosed only her legacy administrative access to the practice's RingCentral phone system, which she asked Prime to revoke because she lacked the ability to remove herself. *Id.* Cucurullo's response did not mention, and did not offer to relinquish or transfer, her administrative control over the Google Ads, Google Business Pages, GoDaddy, or Meta Business Manager accounts described in Paragraphs 57 through 59 below, notwithstanding that Prime's July 27, 2026 demand, described in Paragraph 53 above, expressly called for the return of credentials to Prime's "marketing platforms," "social media accounts," "websites," and "domains." *Id.*

55. On July 31, 2026, Prime's Chief Executive Officer wrote again to identify, by name, the practice-related digital assets that Prime maintained were transferred to it under the October 2022 asset purchase described in Paragraph 43 above, including the domain names drpaulnassif.com, nassifmdmedspa.com, and nassifmedical.com; the Google My Business listings for NassifMD Plastic Surgery and NassifMD Medspa at the practice's Spalding Drive locations in Beverly Hills, California; the Google Ads account titled "NassifMD Plastic Surgery | Dr. Paul Nassif"; the Google Analytics and Google Search Console properties for those domains; and Meta Business Manager's administrative control over the @nassifmedical, @nassifmedspa, and

@nassifmd accounts and associated advertising and tracking assets. Prime stated that its request did not extend to any credential, domain, account, or asset not owned or licensed by Prime, or to any action beyond Cucurullo's authority.

56. Upon Cucurullo's resignation, effective July 31, 2026, Prime notified her in writing that her authorization to access Prime's systems and accounts was terminated, and Prime changed passwords and permissions to the extent it was able. Prime could not fully secure the Google Ads, Google Business Pages, GoDaddy, and Meta Business Manager accounts because Cucurullo alone controlled the credentials to those accounts under her own personal email addresses.

57. Cucurullo created the practice's Google Ads account using her personal email address and held Administrator-level access to it throughout her engagement. Prime received only read-only access to that account, granted to Sarah Throne effective May 28, 2026 through arrangements Cucurullo made with the practice's marketing vendor. When Prime requested administrator-level access to the account it had paid to operate, Cucurullo refused in writing, stating that she lacked the authority to grant it (Exhibit N hereto). Despite the written termination of her own authorization described in Paragraph 56 above, Cucurullo has logged into the Google Ads account at least twice since her resignation, on August 21 and August 27, 2026.

58. The domain names associated with the Nassif practice were conveyed to Prime under the October 2022 asset purchase described in Paragraph 43 above. Cucurullo nonetheless controlled the credentials and multifactor-authentication settings for the GoDaddy account holding those domains. After her departure, and after Prime revoked her authorization as described in Paragraph 56 above, the credentials, recovery email address, and account settings for that GoDaddy account were changed, and Prime has since been unable to access the domains it owns.

59. Cucurullo also changed the recovery email address associated with the practice's Google Business Pages account after her departure. As a result, Cucurullo alone retains effective

administrative control over the Google Ads, Google Business Pages, GoDaddy, and Meta Business Manager accounts that Prime owns or uses to operate the practice, notwithstanding Prime's written revocation of her authorization to access them.

60. As a direct and proximate result of Cucurullo's conduct, Plaintiffs have suffered and will continue to suffer damages, including lost patients, lost revenue, lost goodwill and practice value, the value of compensation paid to Cucurullo during her period of disloyalty, and the costs of investigating and remediating her conduct, in an amount exceeding $75,000, exclusive of interest and costs.

**FIRST CLAIM FOR RELIEF**
**(Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. Section 1836)**

61. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

62. Prime PC and Prime Management own trade secrets that relate to services used in and affecting interstate commerce, including: (a) the practice's compiled patient list, comprising the treatment histories, contact information, surgery dates, and procedure types of the practice's patients, developed and maintained on the PatientNow and EMA platforms described in Paragraph 42 above; (b) its confidential pricing and fee schedules for specific surgical and med-spa procedures; (c) its non-public financial and compensation data; (d) its business and expansion plans; (e) its proprietary patient-communication templates and intake, marketing, and operating systems and forms; and (f) its vendor lists and contract terms. Each of these derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, competing aesthetic-surgery operations that could use this information to solicit Plaintiffs' patients or undercut Plaintiffs' pricing without incurring the cost

of independently developing it, and each was the subject of reasonable measures to maintain its secrecy. The governing agreements corroborate the protected status of this information by expressly defining Prime PC's Confidential Information as a trade secret within the meaning of 18 U.S.C. Section 1839(3). This information relates to services used in and affecting interstate commerce because the practice treats and markets to patients located in multiple states, and its billing, scheduling, and marketing systems operate and are accessed across state lines, and Cucurullo herself accessed, administered, and transmitted this information from New Jersey while the practice she managed operated in California.

63. Plaintiffs took reasonable measures to keep this information secret, and the information derives independent economic value from not being generally known or readily ascertainable by proper means. Those measures included maintaining written personnel policies that restricted the use and disclosure of confidential business, financial, and marketing information to business purposes and to personnel and contractors with a business need for it, and that required the return of Company property, records, and confidential information upon separation.

64. Cucurullo, who was entrusted with this information and owed a duty to maintain its secrecy, misappropriated Plaintiffs' trade secrets without Plaintiffs' consent. She acquired, disclosed, and used them for the benefit of competing ventures by, among other things, forwarding to her personal email accounts Plaintiffs' confidential materials, including a full domain export, patient communications concerning Dr. Nassif's care, and another physician's contracts with the acquiring group; transferring or using Plaintiffs' patient-communication templates and EMA materials to support the competing Sharp Coronado operation; and disclosing Beverly Hills fee and procedure information in connection with the Dubai arrangement. Cucurullo knew or had reason to know that she acquired and used this information by improper means and in breach of her duty to maintain its secrecy.

65. As a direct and proximate result, Plaintiffs are entitled to their actual damages, any unjust enrichment, or a reasonable royalty, together with exemplary damages and attorneys' fees for willful and malicious misappropriation, under 18 U.S.C. Section 1836(b)(3).

**SECOND CLAIM FOR RELIEF**
**(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030)**

66. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

67. The computers, servers, cloud storage accounts, and electronic practice-management and medical-records systems that Plaintiffs used to operate the practice, including the practice's OneDrive environment described in Paragraph 52 above, the PatientNow and EMA systems described in Paragraph 42 above, the Google Ads, Google Business Pages, and Meta Business Manager accounts described in Paragraphs 57 and 59 above, and the GoDaddy account described in Paragraph 58 above (collectively, the "Practice Systems"), are protected computers within the meaning of 18 U.S.C. § 1030(e)(2). The Practice Systems were used in and affected interstate commerce, including by storing and transmitting patient records, billing information, and communications across state lines, and by permitting Cucurullo to access and administer them remotely from New Jersey while the practice operated in California.

68. As alleged above, Prime Management owned the practice's systems and infrastructure, and Prime PC owned the patient medical and financial records maintained on those systems. Cucurullo held administrative access to the Practice Systems solely as an agent entrusted to exercise that access for Plaintiffs' benefit, not as an independent right of her own, and any authority she held did not extend to acting against Plaintiffs' own access to and control over the Practice Systems. Her administrator-level access to PatientNow, for example, extended only to onboarding new users and deactivating the accounts of personnel who had been terminated. Cucurullo's own

July 29, 2026 written response, described in Paragraph 54 above, confirmed that "Ashleigh or another Prime administrator can remove or modify [her] access to PatientNow," corroborating that her administrative rights over that system were subject to Prime's institutional control rather than exclusive to her.

69. Cucurullo nonetheless asserted control over the Practice Systems adverse to Plaintiffs' own interests. As alleged in Paragraph 19 above, she described the practice as operating "outside the normal protocols" and stated that "we are the admin on most our systems," reflecting the degree of control she exercised over Plaintiffs' systems and data.

70. As alleged in Paragraph 52 above and Paragraph 87 below, Cucurullo, without authorization from Plaintiffs, controlled and administered the Practice Systems for competing purposes and participated in the removal, deletion, or withholding of Plaintiffs' records, including the deletion of a large number of files from the practice's OneDrive on or about July 31, 2026.

71. Cucurullo's post-departure conduct independently violates Section 1030. As alleged in Paragraphs 56 and 57 above, Prime notified Cucurullo in writing that her authorization to access the Practice Systems was terminated upon her resignation. Notwithstanding that written revocation, Cucurullo has logged into the Google Ads account, a protected computer that Prime paid to operate, at least twice since her resignation. Cucurullo's access after the written termination of her authorization was without authorization within the meaning of 18 U.S.C. § 1030(a)(2)(C).

72. Cucurullo's conduct with respect to the GoDaddy account likewise violates Section 1030. As alleged in Paragraph 58 above, after Prime revoked her authorization, Cucurullo changed the credentials, recovery email address, and account settings for the GoDaddy account holding Prime's domain names, and Prime has since been unable to access domains it owns. Cucurullo's July 29, 2026 written response, described in Paragraph 54 above, likewise did not disclose or offer to relinquish her control over the GoDaddy account, notwithstanding Prime's written demand for

the return of credentials to Prime's domains. By causing those changes without authorization from Prime, Cucurullo impaired the availability of and Prime's access to a protected computer, causing damage within the meaning of 18 U.S.C. § 1030(e)(8), in violation of 18 U.S.C. § 1030(a)(5)(A).

73. The May 2026 PatientNow lockout independently violated Section 1030. As alleged in Paragraphs 50 and 51 above, Cucurullo's exercise of control over PatientNow excluded Sarah Throne, Alex Swanson, and Tin Francisco, none of whom had been terminated, from a protected computer that Plaintiffs owned and used to operate the practice for approximately six hours, impairing Plaintiffs' access to and the availability of that system within the meaning of 18 U.S.C. § 1030(e)(8). Because Cucurullo's own administrator-level access was limited to onboarding new users and deactivating the accounts of terminated personnel, excluding three active members of Prime's leadership from the system exceeded any authority Cucurullo held. That exclusion coincided with the alteration of Dr. Nassif's Monday calendar descriptions to conceal his Sharp Coronado activity, an alteration Plaintiffs could not observe or prevent while locked out of the system. Cucurullo's representation that the outage resulted from the practice manager, Ms. Ignelzi, "accidentally deleting users" is inconsistent with the timing and effect of the calendar change made during the same window, particularly because Ms. Ignelzi was the only other person who retained access to PatientNow throughout the outage.

74. By causing the transmission of commands that deleted, withheld, or otherwise impaired Plaintiffs' data and their access to and control over the Practice Systems, without authorization from Plaintiffs, Cucurullo caused damage, within the meaning of 18 U.S.C. § 1030(e)(8), to a protected computer, in violation of 18 U.S.C. § 1030(a)(5)(A). In the alternative, Cucurullo intentionally accessed the Practice Systems without authorization to take those actions and, as a result, caused damage and loss to Plaintiffs, in violation of 18 U.S.C. § 1030(a)(5)(C).

75. As a direct and proximate result, Plaintiffs have suffered loss, within the meaning of 18 U.S.C. § 1030(e)(11), including the cost of investigating and responding to Cucurullo's conduct, the fees of the forensic information-technology consultant Plaintiffs retained to investigate that conduct, the cost of attempting to secure and regain access to the Google Ads, Google Business Pages, GoDaddy, and Meta Business Manager accounts described above, the delay to the accounting team's monthly reconciliation and other financial tasks described in Paragraph 50 above, and restoring the integrity and availability of the Practice Systems and data, and the business interruption and lost revenue described above exceeds $5,000 in the aggregate over a one-year period, satisfying 18 U.S.C. § 1030(c)(4)(A)(i)(I). Plaintiffs are entitled to compensatory damages and to injunctive and other equitable relief under 18 U.S.C. § 1030(g), including an order restoring Plaintiffs' full access to and control over the Practice Systems, including the Google Ads, Google Business Pages, GoDaddy, and Meta Business Manager accounts.

## THIRD CLAIM FOR RELIEF
## (Breach of Fiduciary Duty and the Duty of Loyalty)

76. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

77. As the business manager, operational representative, and chief executive of the Nassif practice, Cucurullo occupied a position of trust and confidence and acted as the agent of Prime PC and Prime Management. She therefore owed Plaintiffs a fiduciary duty of undivided loyalty, including the duties not to compete with Plaintiffs, not to act on behalf of interests adverse to Plaintiffs, and not to divert Plaintiffs' business or opportunities.

78. Cucurullo breached those duties by, among other things, working to extract Dr. Nassif and the value of the practice from Plaintiffs' practice platform, developing and promoting

competing operations at Sharp Coronado Hospital and in Newport Beach, diverting patients and revenue through the skincare platform, diverting the practice's advertising accounts, patient leads, and domain names and trademark-related online accounts to interests controlled by Dr. Nassif, developing the Dubai venture using Plaintiffs' confidential business information, misusing Plaintiffs' confidential information and systems, and acting to advance interests adverse to Plaintiffs while she remained entrusted with Plaintiffs' business.

79. Cucurullo engaged in this conduct while continuing to accept compensation through Plaintiffs' structure. For the services that she provided, Plaintiffs processed payments directly to Cucurullo amounting to approximately $260,000.

80. As a direct and proximate result of Cucurullo's breaches, Plaintiffs have suffered damages. Plaintiffs are entitled to disgorgement and forfeiture of the compensation Cucurullo received for services rendered to Plaintiffs' enterprise during her period of disloyalty, compensatory damages, punitive damages, injunctive relief, and any other relief the Court deems proper.

**FOURTH CLAIM FOR RELIEF**
**(Misappropriation of Trade Secrets Under the California Uniform Trade Secrets Act, Cal. Civ. Code Section 3426 Et Seq.)**

81. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

82. The information described above constitutes one or more trade secrets within the meaning of California Civil Code Section 3426.1(d): it derives independent economic value from not being generally known to the public or to others who could obtain economic value from its disclosure or use, and it was the subject of efforts reasonable under the circumstances to maintain its secrecy. The PSA corroborates the protected status of that information, defining Prime PC's

Confidential Information as a trade secret and obligating its return and non-use (Sections 7.1, 5.3(a)). By virtue of her role, access, and the trust reposed in her, Cucurullo owed Plaintiffs a duty to maintain the secrecy of that information and not to use or disclose it for the benefit of a competing venture.

83. Cucurullo misappropriated those trade secrets, within the meaning of California Civil Code Section 3426.1(a) and (b), by acquiring, disclosing, and using them without consent, through improper means and in breach of her duty to maintain their secrecy, including through the specific acts described in Paragraphs 42 through 43 and 64.

84. As a direct and proximate result, Plaintiffs are entitled to injunctive relief under California Civil Code Section 3426.2, damages for actual loss and for any unjust enrichment not captured by actual loss, or a reasonable royalty, under Section 3426.3, exemplary damages for willful and malicious misappropriation under Section 3426.3(c), and attorneys' fees under Section 3426.4.

**FIFTH CLAIM FOR RELIEF**
**(Conversion)**

85. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

86. This claim does not depend on the existence of any trade secret. Apart from any information that qualifies as a trade secret, Prime PC owns the patient medical and financial records and the related accounts receivable, and Prime Management owns the practice's business and financial records, funds, systems and account access, and the practice's domain names and associated online accounts, which are intangible property subject to conversion under California law. The governing agreements provide that all patient medical and financial records are the property of Prime PC and may not be removed or copied without Prime PC's written consent, and

that upon termination all such property and all access to Prime PC's systems must be returned or relinquished. Prime demanded the return of that property and access in writing on July 27, 2026, as alleged in Paragraph 53 above.

87. Cucurullo wrongfully exercised dominion and control over that property in a manner inconsistent with Plaintiffs' rights, including by controlling and administering Plaintiffs' systems and accounts for competing purposes; by moving the practice's domain names into a separate registrar account outside Plaintiffs' control and initiating their transfer to an account associated with a third party; and by participating in the removal, deletion, or withholding of Plaintiffs' records. Cucurullo also failed to disclose or offer to relinquish, in her written response described in Paragraph 54 above, her continued administrative control over the Google Ads, Google Business Pages, GoDaddy, and Meta Business Manager accounts described in Paragraphs 57 through 59 above, despite Prime's written demand two days earlier, described in Paragraph 53 above, for their return.

88. As a direct and proximate result, Plaintiffs have suffered damages and are entitled to compensatory and punitive damages, return of the property, and other relief as the Court deems proper.

**SIXTH CLAIM FOR RELIEF**
**(Unfair Competition, Cal. Bus. & Prof. Code Section 17200 Et Seq.)**

89. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

90. Independent of any misappropriation of a trade secret, Cucurullo engaged in unlawful, unfair, and fraudulent business acts and practices within the meaning of California Business and Professions Code Section 17200, including by breaching her fiduciary duties and duty of loyalty, competing against Plaintiffs while entrusted with their business, using Plaintiffs' resources and

goodwill to develop and promote competing aesthetic plastic surgery operations, and diverting patients, revenue, advertising accounts, and practice opportunities away from Plaintiffs. Plaintiffs lost money or property as a result and therefore have standing under California Business and Professions Code Section 17204.

91. Plaintiffs are entitled to restitution and to preliminary and permanent injunctive relief under California Business and Professions Code Sections 17203 and 17204, and to other relief as the Court deems proper.

**SEVENTH CLAIM FOR RELIEF**
**(Intentional Interference with Contractual Relations)**

92. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

93. Plaintiffs had valid and existing contractual relationships governing Dr. Nassif's obligations to Plaintiffs, including the PSA held by Prime PC and the RCAs held by Prime Management.

94. Cucurullo knew of those contracts and committed intentional acts designed to induce their breach or disruption, including by coordinating and promoting the competing Sharp Coronado and Newport Beach operations outside of Plaintiffs' practice structure and the diversion of patients and revenue, and an actual breach or disruption resulted. One of the contracts gives Prime PC the exclusive right to bill for and collect Dr. Nassif's professional fees and makes all patient medical and financial records the property of Prime PC; Cucurullo's redirection of billing, patients, and records away from Prime PC disrupted those rights.

95. But for Cucurullo's interference, Plaintiffs would have retained the benefit of those contractual relationships. As a direct and proximate result, Plaintiffs have suffered damages and are entitled to compensatory and punitive damages and other relief as the Court deems proper.

**EIGHTH CLAIM FOR RELIEF**
**(Intentional Interference with Prospective Economic Advantage)**

96. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

97. Plaintiffs had economic relationships with patients, referral sources, and prospective patients of the practice that carried a probable future economic benefit to Plaintiffs, and Cucurullo knew of those relationships.

98. Cucurullo engaged in intentional acts, wrongful by a measure beyond the interference itself, that disrupted those relationships, including diverting surgical patients into the preoperative skincare program, directing patients and promotion to the competing Sharp Coronado and Newport Beach operations, and redirecting practice opportunities away from Plaintiffs. The independently wrongful conduct includes Cucurullo's breach of fiduciary duty and misappropriation of Plaintiffs' trade secrets.

99. But for Cucurullo's interference, there was a reasonable probability that Plaintiffs would have realized the anticipated economic benefits. As a direct and proximate result, Plaintiffs have suffered damages and are entitled to compensatory and punitive damages and other relief as the Court deems proper.

**NINTH CLAIM FOR RELIEF**
**(Aiding and Abetting Breach of Fiduciary Duty)**

100. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

101. Dr. Nassif and others owed and breached fiduciary and contractual duties to Plaintiffs, including duties designed to protect Plaintiffs' goodwill, patients, and confidential information.

102. Cucurullo knew that this conduct constituted a breach of duty and gave substantial assistance or encouragement to it, including by coordinating the Sharp Coronado platform, the Newport Beach expansion, the skincare diversion, the Dubai venture, and the misuse of Plaintiffs' information and systems.

103. As a direct and proximate result, Plaintiffs have suffered damages and are entitled to compensatory and punitive damages and other relief as the Court deems proper.

**TENTH CLAIM FOR RELIEF**
**(Civil Conspiracy)**

104. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

105. Cucurullo agreed and acted in concert with Dr. Nassif and his affiliated entities to accomplish the wrongful conduct alleged herein, including the diversion of Plaintiffs' patients, revenue, confidential information, and practice opportunities to competing ventures.

106. The participants shared a common purpose to injure Plaintiffs and committed overt acts in furtherance of the conspiracy, including the Sharp Coronado credentialing and billing setup, the Newport Beach expansion, the skincare diversion, the diversion of the advertising accounts and patient leads, the Dubai venture, and the concealment and deletion of records.

107. As a direct and proximate result, Plaintiffs have suffered damages and are entitled to compensatory and punitive damages and other relief as the Court deems proper.

**ELEVENTH CLAIM FOR RELIEF**
**(Quasi-Contract)**

108. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

109. Cucurullo received and retained benefits at Plaintiffs' expense, including compensation she received for services rendered to Plaintiffs' enterprise during her period of disloyalty and the value of the patients, revenue, and opportunities she diverted from Prime PC and Prime Management.

110. Cucurullo knew she was receiving those benefits during her period of disloyalty, and she unjustly retained those benefits, and equity requires restitution to Plaintiffs.

111. Plaintiffs are entitled to restitution and disgorgement of the benefits Cucurullo unjustly retained.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A. Awarding Plaintiffs compensatory damages in an amount to be determined at trial;

B. Ordering the disgorgement and forfeiture of all compensation, bonuses, and other benefits paid to or received by Defendant during her period of disloyalty;

C. Ordering an accounting and disgorgement of all revenues, profits, and benefits derived from the conduct alleged, and imposing a constructive trust over those amounts;

D. Awarding damages, exemplary damages, and attorneys' fees for willful and malicious misappropriation of trade secrets under 18 U.S.C. § 1836(b) and Cal. Civ. Code Section 3426 Et Seq., and compensatory damages and injunctive relief under 18 U.S.C. § 1030(g) for violation of the Computer Fraud and Abuse Act;

E. Awarding punitive damages to the extent permitted by law;

F. Granting preliminary and permanent injunctive relief restraining Defendant from further use or disclosure of Plaintiffs' confidential information and trade secrets and from further diversion of Plaintiffs' patients, revenue, and opportunities, and restoring Plaintiffs' full access to and control over the Practice Systems described above;

G. Awarding pre-judgment and post-judgment interest, costs of suit, and attorneys' fees to the fullest extent permitted by law; and

H. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial as to all issues so triable.

Dated: September 21, 2026

*s/Eric I. Abraham*
Eric I. Abraham
William P. Murtha
Kristine L. Butler
HILL WALLACK LLP
21 Roszel Road
Princeton, NJ 08543
(609) 924-0808
eabraham@hillwallack.com
wmurtha@hilwallack.com
kbutler@hillwallack.com

OF COUNSEL (*pro hac vice forthcoming*):
William R. Thomas
David B. Summer, Jr.
PARKER POE ADAMS & BERNSTEIN LLP
1221 Main Street
Suite 1100
Columbia, SC 29201
(803) 255-8000
willthomas@parkerpoe.com
dsumner@parkerpoe.com

*Attorneys for Plaintiffs*
*Prime Plastic Surgery Associates Corp.*
*And Prime Plastic Surgery Management LLC*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civil Rule 11.2, the undersigned, attorney of record for Plaintiffs Prime Plastic Surgery Associates Corp. and Prime Plastic Surgery Management LLC, certifies that to the best of my knowledge and based upon the information available to me, the matter in controversy is related to an action currently pending in the Court of Chancery of the State of Delaware, captioned *Prime Plastic Surgery Management LLC and Prime Plastic Surgery Associates Corp. v. Paul S. Nassif, M.D. and Paul Nassif, M.D. Inc.*, C.A. No. 2026-1221-NAC (the "Delaware Action").

The Delaware Action arises from the Restrictive Covenant Agreements between Prime Plastic Surgery Management LLC and Paul S. Nassif, M.D. and Paul Nassif, M.D. Inc., and from the same course of conduct that gives rise to certain of the claims asserted in this action against Defendant Alyce Cucurullo. Defendant Cucurullo is not a party to the Delaware Action. The Delaware Action was filed on September 16, 2026 and remains pending; no trial date has been set.

Except as set forth above, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding, of which the undersigned is aware.

I certify under penalty of perjury that the foregoing is true and correct.

## LOCAL RULE 201.1 CERTIFICATION

I hereby certify that the above-captioned matter is not subject to compulsory arbitration in that the Plaintiffs seek, inter alia, injunctive relief.

Dated: September 21, 2026

*s/Eric I. Abraham*
Eric I. Abraham
William P. Murtha
Kristine L. Butler
HILL WALLACK LLP

OF COUNSEL(*pro hac vice forthcoming*):
William R. Thomas
David B. Summer, Jr.

PARKER POE ADAMS & BERNSTEIN LLP
1221 Main Street
Suite 1100
Columbia, SC 29201
(803) 255-8000
willthomas@parkerpoe.com
dsumner@parkerpoe.com

21 Roszel Road
Princeton, NJ 08543
(609) 924-0808
eabraham@hillwallack.com
wmurtha@hilwallack.com
kbutler@hillwallack.com

*Attorneys for Plaintiffs*
*Prime Plastic Surgery Associates Corp.*
*And Prime Plastic Surgery Management LLC*